IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  06-cv-02153-REB-KLM

UNITED STATES OF AMERICA,

     Plaintiff(s),

v.

DAVID W. GOLDSTON, individually and as Trustee of Old Times Holding Trust, and
Trustee of High Mountain Holding Trust,
NANCY C. GOLDSTON, individually and as a Trustee of Old Times Holding Trust, and
Trustee of High Mountain Holding Trust,
WW INVESTMENT GROUP, LLC, as Trustee of Old Times Holding Trust, and Trustee of
High Mountain Holding Trust,
ARTHUR C.  DAVENPORT, and
FIRST NATIONAL BANK OF PAONIA,

     Defendant(s).

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

### ENTERED BY MAGISTRATE JUDGE KRISTEN  L. MIX

     This matter is before the Court on Plaintiff **United States' Motion for Summary
Judgment** [Docket No. 151; Filed April 11, 2008] ("Plaintiff's Motion for Summary
Judgment").  Defendant WW Investment Group, LLC ("WW")  filed a response on May 1,
2008 [Docket No. 171].  Defendant David Goldston was given an extension of time to
respond [Docket No. 170], and he did so on June 2, 2008 [Docket No. 193].  Although
Defendant David Goldston's response was filed beyond the date of the permitted extension,
the Court accepted it as filed [Docket No. 201].  Plaintiff filed replies to both responses on
May 16, 2008 and June 20, 2008, respectively [Docket Nos. 179 & 210].  The pending
motion has now been fully briefed.  Pursuant to 28 U.S.C. § 636(b)(1) and D.C. Colo. L.
Civ. R. 72.1.C, the motion has been referred to this Court for recommendation.  Having

considered the pleadings and the docket in this case, the Court is fully advised of the issues. For the reasons set forth below, the Court recommends that Plaintiff's Motion for Summary Judgment be **GRANTED**.

Also before the Court are **Defendant WW Investment Group, LLC's Motion for Summary Judgment** [Docket No. 146; Filed April 1, 2008] ("WW's Motion") and **Defendant [Dr.] Goldston's Motion for Summary Judgment** [Docket No. 202; Filed June 6, 2008] ("Dr. Goldston's Motion") (collectively "Defendants' Motions for Summary Judgment"). As to WW's Motion, default judgment was entered against this Defendant on July 28, 2008 [Docket No. 217]. Accordingly, the Court recommends that WW's Motion be **DENIED**. In any event, because the Court recommends that Plaintiff's Motion for Summary Judgment be granted, the Court recommends that Defendants' Motions for Summary Judgment be **DENIED**.[1]

## I. Background

The above-captioned lawsuit was brought by Plaintiff United States of America on October 26, 2006 [Docket No. 1]. The purpose of the lawsuit was to recover unpaid taxes allegedly owed by Defendant David Goldston ("Dr. Goldston") to Plaintiff. Specifically, Plaintiff sought to

> set aside fraudulent transfers of real estate property from [Dr.] Goldston and Nancy C. Goldston [("Mrs. Goldston")] to several purported trusts that are shams and the nominees and/or alter egos of [Dr.] Goldston; to foreclose federal tax liens against those parcels of real property . . .; and to sell those

---

[1] Also before the Court is Plaintiff **United States' Motion to Strike Exhibit C-2 to W.W. Investment Group, LLC's Response to the United States' Motion for Summary Judgment** [Docket No. 180; Filed May 16, 2008] ("Motion to Strike"). For the reasons given below in Part III.B.1, the Court recommends that the Motion to Strike be **GRANTED**.

parcels of real property and apply the proceeds attributable to interests of [Dr.] Goldston therein to his federal tax liabilities . . . .

*Complaint* [#105] at 1-2.

The properties at issue are referred to throughout this Recommendation and the parties' pleadings as Lot 2 and Lot 3, and are located in Gunnison County, Colorado. High Mountain Holding Trust is the so-called Trustee of Lot 2. Old Times Holding Trust is the so-called Trustee of Lot 3. Defendant WW Investment Group, LLC ("WW") is the Trustee of both Trusts. Defendants Arthur C. Davenport and the Bank of Paonia have disclaimed any interest in this lawsuit [Docket Nos. 8 & 9].

## II. Statement of the Case and the Parties' Arguments

(1) Dr. Goldston and Mrs. Goldston are husband and wife and have been married since 1972. *Dr. Goldston Deposition* [#151-4] at 15:20-16:2; *Mrs. Goldston Deposition* [#151-5] at 23:25-24:6.

(2) Dr. Goldston and Mrs. Goldston stopped filing their federal tax returns after the 1990 tax year. *Dr. Goldston Deposition* [#151-4] at 135:6-18.

(3) Dr. Goldston was a member of the "Save a Patriot Fellowship." *Id.* at 137:25-138:15. The Fellowship is subject to a permanent injunction which forbids its members from advising people that they are not required to pay their taxes. *United States v. Kotmair*, WMN-05-1297, 2006 WL 4846388 (D. Md. Nov. 29, 2006) (unpublished decision).

(4) Dr. Goldston was indicted by a federal grand jury on November 9, 2004 for failing to pay his taxes for the years of 1990 and 1991 [Docket No. 151-10].

(5) Dr. Goldston was convicted of tax evasion in June 2005 and sentenced in December 2005 to forty-eight (48) months in federal prison [Docket No. 151-11]. He began

serving his sentence in February 2006. *Dr. Goldston Deposition* [#151-4] at 17:14-18.

(6) On October 28, 1996 and November 7, 2005, the Internal Revenue Service ("IRS") assessed federal tax liabilities against Dr. Goldston and demanded payment of his unpaid federal taxes [Docket No. 151-9]. The amount and validity of the assessment are disputed in Defendants' responses to Plaintiff's Motion for Summary Judgment, but there are no affidavits or documentary evidence to support Defendants' contentions. *See Dr. Goldston's Response* [#193] at 6-9, 19; *WW's Response* [#171] at 4, 8-9. Further, Dr. Goldston's total remaining tax liability has now been judicially determined by the District Court for the Middle District of Florida, thus eliminating any dispute, supported or unsupported, of this issue [Docket No. 214-2]. *See United States v. Goldston*, No. 8:06-cv-1873-T-30-TBM (M.D. Fla. July 8, 2008).

(7) Dr. Goldston failed to pay the amount assessed by the IRS, as well as the accrued interest. *Declaration of Ken E. Colt* [#151-2] at 3.

(8) On September 28, 2007, $600,000 was paid toward Dr. Goldstons' tax liabilities for the 1991 tax year. *Id.* This amount was obtained in a settlement of a related case from the sale of another property owned by the Goldstons. *Declaration of Karen L. Pound* [#151-3] at 10. The parties dispute whether $600,000 was enough to satisfy Dr. Goldston's outstanding tax liabilities. *Plaintiff's Motion for Summary Judgment* [#151] at 8; *Dr. Goldston's Response* [#193] at 6-9, 19. No documentary evidence or affidavits support Defendants' contentions that $600,000 was enough to satisfy Dr. Goldston's debt, and the Court notes that the District Court for the Middle District of Florida determined that even after the liability amount was reduced by $600,000, Dr. Goldston still owed $197,465.16 as of May 5, 2008. *Goldston*, slip op. at 3 & n.3. This amount continues to grow over time as

4

interest accrues. *Declaration of Ken E. Colt* [#151-2] at 3.

(9) On April 17, 1998, Plaintiff filed Notices of Federal Tax Liens in Gunnison County, Colorado which identified High Mountain Holding Trust and Old Times Holding Trust as nominees of Dr. Goldston [Docket Nos. 151-12 & -13]. Whether the Trusts are properly labeled as nominees of Dr. Goldston is disputed by the parties. *Plaintiff's Motion for Summary Judgment* [#151] at 18-20; *Dr. Golston's Response* [#193] at 15-19; *WW's Response* [#171] at 9-12. Other than Dr. Goldston's deposition testimony, there are no affidavits or documentary evidence submitted by Defendants that meaningfully address this issue.

### Lot 2 History

(10) On April 4, 1991, Dr. Goldston contracted to buy Lot 2 for $140,000 [Docket No. 151-14]. On August 1, 1991, a warranty deed was filed with the Gunnison County Clerk and Recorder for Lot 2 in the name of Dr. Goldston and Mrs. Goldston [Docket No. 151-15 & -16].

(11) On July 17, 1992, a warranty deed was filed with the Gunnison County Clerk and Recorder which transferred title to Lot 2 from the Goldstons to High Mountain Holding Trust for consideration of $10.00 [Docket No. 151-17]. The legal effect of this transfer is the issue before the Court pursuant to Plaintiff's Motion for Summary Judgment.

(12) Dr. Goldston created and chose the name for High Mountain Holding Trust. *Dr. Goldston Deposition* [#151-4] at 78:22-79:7. The purpose for its creation is in dispute. Dr. Goldston testified that the beneficiaries were his children and grandchildren, but there is no documentary evidence which supports this contention. *See id.* at 44:16-47:2, 81:19-82:3. Dr. Goldston also served as the Trust Manager for the Trust. *Id.* at 86:11-24. High

Mountain Holding Trust does not have a tax identification number and has never filed an income tax return [Docket No. 151-19].

(13) Mail addressed to High Mountain Holding Trust was sent and received by Dr. Goldston at the address of his dental practice in Florida. *Mrs. Goldston Deposition* [#151-5] at 84:13-23; *Roswell Checketts Deposition* [#151-6] at 85:18-25.[2]

(14) At some point after the High Mountain Holding Trust was created and transferred title to Lot 2, the Goldstons refinanced the loan for Lot 2 in their own names, not in the name of High Mountain Holding Trust. *Roswell Checketts Deposition* [#151-6] at 46:2-56:5. In addition, the Goldstons, rather than the Trust, continued to make the mortgage and real estate tax payments for Lot 2 [Docket No. 151-35]. Part of the funds to pay these expenses came from grazing fees paid directly to the Goldstons by a third party [Docket Nos. 151-22 through -26]. Dr. Goldston testified that the mortgage and real estate tax payments should be construed as gifts to the Trust. *Dr. Goldston Deposition* [#151-4] at 87:16-21, 131:7-19.

**Lot 3 History**

(15) On October 30, 1981, Dr. Goldston contracted to buy Lot 3 for $90,000 [Docket No. 151-28]. On November 5, 1981, a warranty deed was filed with the Gunnison County Clerk and Recorder for Lot 3 in the name of Dr. Goldston and Mrs. Goldston [Docket No. 151-29]. Thereafter, the Goldstons spent over $200,000 to build a cabin on Lot 3, which was completed in 1991. *Dr. Goldston Deposition* [#151-4] at 23:1-24:15.

---

[2] Roswell Checketts is a relative of the individuals who sold Lots 2 and 3 to the Goldstons. He has power-of-attorney over the sellers' business dealings, and dealt with the Goldstons regarding financial matters after the sale of the properties. *Plaintiff's Motion for Summary Judgment* [#151] at 9 n.3.

(16) On July 17, 1992, a warranty deed was filed with the Gunnison County Clerk and Recorder which transferred title to Lot 3 from the Goldstons to Old Times Holding Trust for consideration of $10.00 [Docket No. 151-31].  However, the Trust never tendered any money for this transfer.  Although Dr. Goldston contends that the "record is clear" that consideration was paid, he fails to cite to any documents proving this statement.  *See Dr. Goldston's Response* [#193] at 16.  Indeed, in his deposition, he admitted that no consideration was paid.  *Dr. Goldston Deposition* [#151-4] at 28:5-8.  The legal effect of this transfer is the issue before the Court pursuant to Plaintiff's Motion for Summary Judgment.

(17) Dr. Goldston created and chose the name for Old Times Holding Trust.  *Id.* at 51:7-17.  The purpose for its creation is in dispute.  Dr. Goldston testified that the beneficiaries were his children and grandchildren, but there is no documentary evidence which supports this contention.  *See id.* at 44:16-47:2.  He also served as the Trust Manager for the Trust.  *Id.* at 29:25-33:6.  Old Times Holding Trust does not have a tax identification number and has never filed an income tax return [Docket No. 151-34].  *Dr. Goldston Deposition* [#151-4] at 51:11-17.

(18) At some point after Old Times Holding Trust was created and transferred title to Lot 3, the Goldstons personally secured a loan in the name of the Trust, but with no apparent involvement from the Trustee, in the amount of $102,000 from the First National Bank of Paonia [Docket Nos. 151-36 through -39].  Dr. Goldston testified that the decision to secure the loan was made by "the trustee, myself."  *Dr. Goldston Deposition* [#151-4] at 57:15.  Dr. Goldston also testified that the loan was made for "investment purposes," that Lot 3 was used as the collateral for the loan, and that he guaranteed and personally paid back the loan with his own funds.  *Id.* at 55:17-60:1, 70:25-72:18.  In addition, the

Goldstons, rather than the Trust, continued to make the mortgage and real estate tax payments for Lot 3. *Id.* at 28:9-20, 34:7-23. Dr. Goldston testified that the mortgage and real estate tax payments should be construed as gifts to the Trust. *Dr. Goldston Deposition* [#151-4] at 28:5-20, 34:14-15.

(19) After the warranty deed for Lot 3 was transferred to Old Times Holding Trust, the Goldstons and their family members continued to use the cabin on Lot 3 without paying rent; however, Dr. Goldston testified that he paid rent via "sweat equity." *Dr. Goldston Deposition* [#151-4] at 35:10-25. Whether Dr. Goldston needed or received consent for the use of the property appears to be in dispute. There is no documentary proof that Dr. Goldston had written consent to use the property, although he testified in his deposition that he believed written consent existed. *See id.* at 40:22-41:9.

(20) Mail addressed to Old Times Holding Trust was sent to and received by Dr. Goldston [Docket No. 151-46]. *Dr. Goldston Deposition* [#151-4] at 62:4-6.

(21) At some time after the transfer of the warranty deed for Lot 3 to Old Times Holding Trust, as well as after the $102,000 loan was secured, Dr. Goldson sought to obtain a second loan from the Bank of Paonia using Lot 3 as collateral [Docket Nos. 151-47 through -49. *Dr. Goldston Deposition* [#151-4] at 62:23-68:9. This loan was ultimately denied [Docket No. 151-50].

(22) The Goldstons maintained the homeowner's insurance on the cabin built on Lot 3 after title was transferred to Old Times Holding Trust [Docket No. 151-51].

In addition to the issues raised above, the parties dispute what amount, if any, Dr. Goldston owes the IRS. At the time of the filing of its Motion for Summary Judgment on April 11, 2008, Plaintiff contended that Dr. Goldston's outstanding tax liability was

$196,689.84. *Plaintiff's Motion for Summary Judgment* [#151] at 8; *Declaration of Ken E. Colt* [#151-2] at 3. Dr. Goldston and WW dispute that this dollar amount is accurate and claim that the correct dollar amount remains unsettled, although neither provides any documentary or testimonial evidence to support this. *See Dr. Goldston Response* [#193] at 6-9; *WW Response* [#171] at 4. The ruling of the District Court for the Middle District of Florida resolves any dispute. As of May 5, 2008, and considering the accrual of interest, Dr. Goldston was found to owe $197.465.26 in unpaid taxes for 1991. *Goldston*, slip op. at 3, 8.

The parties also dispute the effect of Dr. Goldston's involvement with Lots 2 and 3 after the titles were transferred to the Trusts. Plaintiff contends that the level of control maintained by Dr. Goldston amounts to the Trusts being nominees or the alter egos of Dr. Goldston. For instance, in relation to Lot 3, Plaintiff contends that "Dr.Goldston was the de facto controller and user of the property." *Plaintiff's Motion for Summary Judgment* [#151] at 14. Dr. Goldston and WW contend that the transfers effectively transferred ownership from the Goldstons to the Trusts such that Plaintiff's nominee and alter ego theories have no merit. For instance, they contend that Dr. Goldston needed to obtain and did obtain written permission to use Lot 3. *See WW Response* [#193] at 7. While there is no documentary evidence to support this, Dr. Goldston did testify to this effect. *See Dr. Goldston Deposition* [#151-4] at 40:22-41:9. They also contend that the facts used by Plaintiff to justify its nominee/alter ego theories also point to Dr. Goldston being a mere Trust Manager for the transferred properties.

Finally, the parties dispute the effect, if any, of alleged bonds secured from benefactors of Dr. Goldston on Dr. Goldston's continuing tax liability. *Dr. Goldston's*

*Response* [#193] at 2, 19; *Plaintiff's Reply* [#210] at 11-12. However, the Court finds that this issue is not in dispute for purposes of resolving Plaintiff's Motion for Summary Judgment because (1) there are no documents to support that the bonds have value; and (2) the District Court for the Middle District of Florida found that the alleged bonds had no effect on Dr. Goldston's outstanding tax liability. *Goldston*, slip op. at 6.

## III. Analysis

### A. Standard of Review

The primary Motion before the Court is Plaintiff's Motion for Summary Judgment. Summary judgment is proper when the record before the court "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if the outcome could be decided in favor of either party. *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994). A fact is "material" if it could reasonably affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the movant does not bear the ultimate burden at trial, it need only satisfy the initial burden of demonstrating the absence of evidence to support the nonmovant's case. But where the movant bears the ultimate burden of proof at trial, it must submit evidence to establish every element of its claims. *In re Ribozyme Pharm. Inc. Sec. Litig.*, 209 F. Supp. 2d 1106, 1111 (D. Colo. 2002). Once the motion has been properly supported, the burden shifts to the nonmovant to show the existence of a genuine dispute of a material issue. The nonmoving party must go beyond the allegations in its pleading and provide "specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). To satisfy its burden of providing specific facts, the nonmoving party must

tender affidavits of other competent evidence. *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The factual record and inferences therefrom are viewed in the light most favorable to the nonmoving party. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998). However, the Court is not obligated to consider conclusory statements or testimony based on conjecture, subjective belief, or inadmissible evidence. *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999).

### B. Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment in its favor. In support of the Motion, Plaintiff contends that (1) it has a valid federal tax lien, and (2) that the taxpayer has an interest in the properties that the lien seeks to foreclose such that it is entitled to summary judgment. *Plaintiff's Motion for Summary Judgment* [#151] at 15-18. Defendants WW and Dr. Goldston responded and contested these conclusions, but with the exception of Dr. Goldston's deposition testimony, they point to no admissible evidence to support their arguments. For instance, Dr. Goldston's response is not supported by his affidavit, and while he attaches a myriad of documents to his response, nothing speaks with clarity to any of the issues presented in Plaintiff's Motion for Summary Judgment. WW's response fares no better and, as explained below, attaches no admissible evidence that the Court can consider in review of Plaintiff's Motion for Summary Judgment. To the extent that Plaintiff seeks summary judgment in its favor, the Court finds that Plaintiff's pleadings and exhibits contain virtually the only relevant, admissible evidence.

### 1. Preliminary Issues

In regard to WW's response to Plaintiff's Motion for Summary Judgment, the only supporting documentary evidence attached by WW is an un-notarized "declaration" signed

by Jeff Townley as the "Director, Member" of WW ("only as Trustee of Old Times and High Mountain") [Docket Nos. 171-2, -3]. Further, this unsworn "declaration" does not purport to be signed under penalty of perjury and, consequently, does not comply with 28 U.S.C. § 1746. Plaintiff moved to strike the "declaration" because (1) it is not a valid affidavit; and (2) because it contains information that was not produced in discovery due to WW's discovery abuses. *Motion to Strike* [#180] at 4. As to the latter contention, WW's discovery misconduct is well documented by this Court, and a Recommendation to enter default judgment against WW [Docket No. 184] was recently adopted by District Court Judge Robert E. Blackburn [Docket No. 217]. The Court agrees that it would be inconsistent with the Recommendation and Order entering default judgment to allow WW to assert information it refused to produce in discovery in support of its response herein. *See* Fed. R. Civ. P. 37(b)(2)(A)(ii) & (iii). As to the former contention, the Court also agrees that it is not obligated to treat an unsworn "declaration" as an affidavit for purposes of establishing factual disputes in opposition to a summary judgment motion. *Hayes v. Marriott*, 70 F.3d 1144, 1148 (10th Cir. 1995) ("Unsworn affidavits do not raise factual issues precluding summary judgment." (citation omitted)); *see also Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 n.1 (10th Cir. 1994) (noting that unsworn affidavits may be used in summary judgment proceedings, but only if they comply with the requirements of 28 U.S.C. § 1746 and are signed under penalty of perjury).

Further, WW's attempt to remedy the shortcomings of the "declaration" is unavailing. In response to Plaintiff's Motion to Strike [Docket No. 185], WW attached the first page and the signature page of the "declaration" upon which an unknown individual handwrote "Pursuant to USC 28 § 1746, the Trustee declares as follows:" and "I declare under penalty

of perjury that the foregoing is true and correct" [Docket No. 185-2]. This haphazard attempt to correct the deficient "declaration" of Jeff Townley is woefully inadequate. First, it is unclear who handwrote the new language on the previously-executed "declaration." Second, the amended signature page submitted by WW on May 27, 2008, was signed May 1, 2008, and is clearly the signature page from the previous ineffectual declaration. At the time it was signed on May 1, 2008, the "declaration" was NOT signed under penalty of perjury, and slapping an averment onto the signature page AFTER its execution does not change that fact. *See, e.g.*, *Flowers v. Abex Corp.*, 580 F. Supp. 1230, 1233 n.2 (N.D. Ill. 1984) ("Merely notarizing the signature does not transform a letter into an affidavit . . . .").

The Court finds that the "declaration" is not an affidavit for the purposes of resolving Plaintiff's Motion for Summary Judgment. *See Sofford v. Schindler Elevator Corp.*, 954 F. Supp. 1459, 1462 (D. Colo. 1997) (holding that unsworn witness statement was not competent evidence for consideration in ruling on summary judgment motion); 10B Charles Alan Wright et al., *Federal Practice and Procedure* § 2738, at 362-65, 372-74 (1998) (recognizing that affidavits which do not meet the requirements of Fed. R. Civ. P. 56(e) should not be given any probative force and are subject to being stricken). The Court also finds that to the extent that the "declaration" contains discoverable information that was not provided to Plaintiff, it is likewise subject to rejection. *See* Fed. R. Civ. P. 37(b)(2)(A)(ii) & (iii). Pursuant to this Recommendation, the Court also recommends that Plaintiff's Motion to Strike [#180] be **GRANTED** and that WW's Exhibit C-2 [Docket Nos. 171-2, -3] be **STRICKEN**. In any event, the Court does not consider Jeff Townley's defective "declaration" herein.

## 2. Merits of Plaintiff's Motion for Summary Judgment

The issue in this case is whether the United States is entitled to foreclose its federal tax lien on Lots 2 and 3 to satisfy Dr. Goldston's outstanding tax liabilities. Because the United States is the Plaintiff in this suit, it has the ultimate burden to demonstrate that foreclosure is appropriate. *See In re Ribozyme Pharms.*, 209 F. Supp. 2d at 1111. Plaintiff must establish that (1) it has a valid federal tax lien, and (2) that the taxpayer has an interest in the properties that the lien seeks to foreclose. *See United States v. Janis*, 428 U.S. 433, 440-41 (1976); *United States v. Miller Bros. Const. Co.*, 505 F.2d 1031, 1036 (10th Cir. 1974).

### a. Valid Federal Tax Lien

Pursuant to 26 U.S.C. § 6321, a tax lien arises when (1) the taxpayer is found to be liable to pay any tax; (2) a demand has been made for such payment; and (2) the taxpayer has refused to pay. The second element is satisfied when the taxpayer receives an assessment from the IRS indicating that the taxpayer is in arrears of his tax payments and demanding that payment be made. In this case, there is no dispute that Dr. Goldston received such an assessments dated October 28, 1996 and November 7, 2005 [Docket Nos. 151-2, 151-9]. The dispute on this issue appears to be centered on whether the tax lien at issue is valid because "the amount of unpaid tax for which David Goldston is liable is not a settled issue." *WW's Response* [#171] at 4. Dr. Goldston alternatively contends that Plaintiff has no statutory authority to collect taxes from him. *Dr. Goldston's Response* [#193] at 6-9.

As to Dr. Goldston's contention regarding Plaintiff's alleged lack of authority, the Court rejects it immediately. Dr. Goldston has been found guilty of tax evasion for the 1991 tax year [Docket No. 151-11]. *See Goldston*, slip op. at 3. Moreover his, as well as every

citizen's, responsibility to pay taxes is well settled. *See Helvering v. Mitchell*, 303 U.S. 391, 399 (1938); *United States v. Tedder*, 787 F.2d 540, 542 (10th Cir. 1986); *Abell v. Sothen*, 214 Fed. Appx. 743, 757 (D. Colo. Jan. 24, 2007) (unpublished decision). As to Defendants' other contention that unless the amount of unpaid tax is settled the tax lien cannot be valid, the Court notes that since these arguments were asserted, Dr. Goldston's unpaid tax liability has been judicially determined by the District Court for the Middle District of Florida. *Goldston*, slip op. at 3, 8. While the Court does not pass judgment on whether an unsettled amount invalidates a tax lien, it is worth noting that a "federal tax lien is perfected upon assessment and no further action need be taken." *United States v. Novotny*, 90 A.F.T.R.2d 2002-5684, 2002-5695 (D. Colo. 2002) (citing *United States v. Vermont*, 377 U.S. 351, 352 (1964)). Further, "[a]n assessment of tax as well as an assessment for failure to file tax returns and make estimated tax payments are entitled to a presumption of validity." *Id.* at 2002-5694 (citations omitted).

In any event, Dr. Goldston's unpaid tax liability for the year of 1991 has now been determined by the District Court for the Middle District of Florida, and the Court is entitled to give this opinion precedential weight. *Sunshine Anthracite Coal. Co. v. Adkins*, 310 U.S. 381, 402 (1940) ("A judgment is res judicata in a second action upon the same claim between the same parties or those in privity with them."); *Fransen v. Conoco, Inc.*, 64 F.3d 1481, 1486 (10th Cir. 1995) ("Under the doctrine of collateral estoppel, once a court decides an issue of law or fact that was fairly and fully litigated and necessary to its judgment, that issue may not be relitigated in a suit on a different cause of action."); *N. Natural Gas Co. v. Grounds*, 931 F.2d 679, 681 (10th Cir. 1991) (discussing res judicata and collateral estoppel and noting that "[i]n our system of jurisprudence the usual rule is

that, once decided in a court of competent jurisdiction, merits of a legal claim are not subject to redetermination in another forum"). Further, the court specifically recognized that $600,000 had been deducted from the figure derived by the IRS, and Dr. Goldston was found to nevertheless owe $197,465.16 as of May 5, 2008. *Goldston* slip op. at 3 & n.3.[3]

Even if the Court did not give preclusive effect to the District Court for the Middle District of Florida's opinion, the Court finds that Plaintiff's declaration regarding Dr. Goldston's outstanding tax liabilities as of April 11, 2008 is well supported by evidence in the record, including the 1996 and 2005 assessments [Docket Nos. 151-2, -9]. Because the assessments are given a presumption of correctness, the burden shifts to Defendants to submit admissible evidence to rebut that presumption. *Novonty*, 90 A.F.T.R.2d at 2002-5694. Neither Defendant has submitted admissible evidence that purports to speak to this issue.

In addition, the District Court for the Middle District of Florida also determined that Dr. Goldston's argument regarding the existence of alleged bonds in satisfaction of his outstanding tax debt had no merit. *Id.* at 6. Specifically, the court held:

---

[3] Despite Dr. Goldston's notice to this Court of his intent to seek reconsideration of the District Court for the Middle District of Florida's verdict [Docket No. 216], it is a final judgment for these purposes and entitled to precedential consideration by this Court. *See Sherrer v. Sherrer*, 334 U.S. 343, 367 (1948) ("Res judicata forecloses relitigation if there has been an opportunity to litigate once, whether or not it has been availed of, or carried as far as possible."); *Phelps v. Hamilton*, 122 F.3d 1309, 1318 (10th Cir. 1997) (recognizing "that the fact that an appeal is pending in a case does not generally vitiate the res judicata effect of a judgment"); *Knox v. Lederle Labs.*, 4 F.3d 875, 880 (10th Cir. 1993) (noting that a final judgment "is not deprived of finality by the fact that time still permits commencement of proceedings . . . to set aside the judgment . . ." (quoting Restatement (Second) of Judgments § 13 cmt. f (1982)); *Greer v. County of Cook*, 54 Fed. Appx. 232, 235 (7th Cir. Dec. 16, 2002) ("When two lawsuits are pending simultaneously in different courts, preclusive effect is given to the judgment that is entered first."); Charles Alan Wright, et al., *Federal Practice and Procedure* § 4433, at 78 (2d ed. 2002) ("The bare act of taking an appeal is no more effective to defeat preclusion than a failure to appeal.").

The bonds allegedly posted by Defendant have not been accepted by the IRS, because they do not appear to be legitimate financial instruments which have any value. The bonds at issue have not been executed by a surety company holding a certificate of authority from the Secretary of the Treasury or secured by bonds or notes of the United States, as required by Treas. Reg. § 301.7101-1(b)(1). Defendant has furnished no factual basis to support his contention that the bonds meet the statutory and regulatory requirement for bonds intended to pay off federal tax obligations. Further, Defendant has furnished no factual basis to support his contention that the IRS accepted such bonds in lieu of payment. Accordingly, the purported bonds do not relieve Defendant from his remaining federal income tax assessments.

*Id.* The same is true in this case. WW and Dr. Goldston have failed to attach any documentary evidence to their responses to Plaintiff's Motion for Summary Judgment tending to prove the validity of these bonds.

In addition, District Court Judge Blackburn has recently directed the Clerk of Court to destroy documents submitted by a third party purporting to offer proof of the legitimacy of one of the alleged bonds at issue here [Docket No. 219]. Judge Blackburn concluded that "[t]here is no evidence that the bond has been executed in accordance with 26 C.F.R. § 301.7101-1(a) & (b), nor is there any argument, authority, or evidence to show that the IRS has accepted the bond in lieu of payment. The documents, therefore, are a nullity as far as these proceedings are concerned." *Order* [#219] at 2. Judge Blackburn also noted that "an identical but more recently executed bond has been issued" and attached to WW's Motion, but "[i]t is not clear what, if any, effect this latest bond has on the prior one." *Id.* at 2 n.3. Plaintiff responded to WW's Motion [#146] and specifically addressed the legitimacy of the later-issued bonds, noting that the bonds do not satisfy 26 C.F.R. § 301.7101-1(b)(i) and (ii) "because 1) they were not issued by a surety company holding a certificate of authority from the Secretary as an acceptable surety on Federal bonds and 2) are not

secured by bonds of notes of the United States." *Plaintiff's Response* [#161] at 9.  As noted above, the Court finds that Defendants have failed to provide evidence that these identical, later-issued bonds meet the statutory and regulatory requirement for bonds which could satisfy Dr. Goldston's federal tax obligations.  As such, I find that the alleged bonds attached to WW's Motion are equally without value and are of no legal effect herein.

Considering all of the above, the Court finds that there is no genuine dispute about the validity of the federal tax lien at issue here.  At a minimum, as of April 11, 2008, Plaintiff owes $196,689.84, plus any interest which accrues after that date [Docket No. 151-2].  Moreover, as of May 5, 2008, the District Court for the Middle District of Florida determined that Plaintiff owes $197,465.16, plus any interest which accrues after that date.  *Goldston* slip op. at 8.

### b.  Taxpayer Interest in the Properties Sought to be Foreclosed

A valid tax lien attaches to any property owned by the taxpayer.  26 U.S.C. §§ 6321, 6322.  Plaintiff asserts that Dr. Goldston is the effective owner of Lots 2 and 3.  As such, it argues that the IRS is entitled to foreclose on these properties to satisfy Dr. Goldston's outstanding tax liability.  Plaintiff further argues that foreclosure of these properties is justified by either the nominee theory of ownership or the alter ego theory of ownership.  *Plaintiff's Motion for Summary Judgment* [#151] at 16.  Essentially, Plaintiff contends that the transfer of the titles to Lots 2 and 3 to Trusts were sham transfers for the purpose of shielding these properties from being used to satisfy Dr. Goldston's outstanding tax debt.

### i.  Nominee Theory

"A nominee is one who holds bare legal title to property for the benefit of another." *Scoville v. United States*, 250 F.3d 1198, 1202 (8th Cir. 2001).  It is a well-settled principle

that the "Government may foreclose on property held by a nominee of a taxpayer in order to collect the taxpayer's debt." *United States v. Schaeffer*, 245 B.R. 407, 415 (D. Colo. 1999) (citing *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 351 (1977)). Courts consider several factors to determine whether a title holder should be given nominee status, the most important of which is the taxpayer's ability to exert control over, either directly or indirectly, the property at issue. *See id.* (citing *Valley Fin., Inc. v. United States*, 629 F.2d 162, 172 (D.C. Cir. 1980)).

> [T]he following considerations are relevant in determining whether an individual or a corporation holds property as the nominee of another: (1) the lack of consideration paid by the nominee; (2) the control exercised over the property by the transferor while the title is in the nominee's name; (3) the close relationship between the transferor and the nominee; (4) the use by the transferor of the transferred property; and (5) the lack of interference in transferor's use of property by the nominee.

> Additionally, courts sometimes consider whether the property was placed in the name of a nominee in anticipation of a suit or the occurrence of liabilities.

*Novotny*, 90 A.F.T.R.2d at 2002-5695 through -5696 (citations omitted).

As to Lot 2, Plaintiff argues that the facts in evidence clearly show that High Mountain Holding Trust is a mere nominee of Dr. Goldston. **First**, little to no consideration was paid for the transfer of the deed from Dr. Goldston to High Mountain Holding Trust. The deed lists a mere $10 as the consideration paid [Docket No. 151-17] and there is no evidence this sum was ever paid by the Trust. **Second**, Dr. Goldston exerted control over Lot 2 following the transfer by (1) serving as the Trust Manager, (2) refinancing the loan for Lot 2 in his and his wife's name, not the name of the Trust, (3) paying the mortgage on Lot 2; (4) paying the property taxes; (5) using his dental practice address to send and receive mail for the Trust; and (6) receiving the profits from the leasing rights provided to a third

party.[4]  *Dr. Goldston Deposition* [#151-4] at 86:11-24, 87:16-21, 131:7-19; *Mrs. Goldston*

*Deposition* [#151-5] at 84:13-23; *Roswell Checketts Deposition* [#151-6] at 85:18-25.

**Third**, there is a close relationship between Dr. Goldston and the Trust because the Trust

would not exist apart from Dr. Goldston.  There is no dispute that he created and named

it and served as the Trust Manager (for at least six years after its creation and following his

receipt of the tax assessment in 1996).  *Dr. Goldston Deposition* [#151-4] at 78:22-79:7.

In addition, the alleged purpose of the Trust was to benefit Dr. Goldston's family members.

*Id.* 44:16-47, 81:19-82:3.  Further, the Trust does not have a tax identification number and

has never filed a tax return [Docket No. 151-19].  **Fourth**, Dr. Goldston continued to access

Lot 2 after the transfer to the Trust.  He served as the Trust Manager at least until 1998 and

maintained the property.  *Dr. Goldston Deposition* [#151-4] at 86.  As Lot 2 was an

undeveloped parcel of land, the use of it was limited, but the Goldstons continued to drive

through the property and leased a portion out to be used for grazing and hunting tours

[Docket Nos. 151-22 through -26].  *Roswell Checketts Deposition* [#151-6] at 101:5-103:12.

The Goldstons, not the Trust, directly received the profits from the leasing rights.  *Dr.*

*Goldston Deposition* [#151-4] at 29:2-24.  **Fifth**, the Trust did not interfere with Dr.

Goldston's use of or control over the property, specifically, it did not interfere when the

Goldstons refinanced the loan on Lot 2 in their own names, rather than in the name of the

---

[4] As to the leasing rights, Plaintiff asserted that they pertained to Lot 2.  In addition, in his response, Dr. Goldston indicated that the leasing rights were associated with Lot 2.  *Dr. Goldston's Response* [#193] at 15.  However, in Dr. Goldston's deposition, he indicated that the leasing rights and the money derived from those rights were associated with Lot 3.  In contrast to that testimony, Roswell Checketts testified that the leasing rights were associated with Lot 2. *Roswell Checketts Deposition* [#151-6] at 101:5-103:12.  The Court is inclined to attribute the evidence relating to leasing rights to Lot 2 because the majority of the pleadings attribute this issue to Lot 2.  Given the various examples of control exerted by Dr. Goldston over both lots, the attribution of the leasing rights to either Lot 2 or Lot 3 is not material.

Trust.  *Roswell Checketts Deposition* [#151-6] at 55:25-56:9.  Further, mail to and from the Trust was addressed to Dr. Goldston's dental practice address in Florida, and the Trust did not have a bank account.  *Id.* at 34:6-23, 85:18-25; 128:1-129:24.  The Trust also did not require Dr. Goldston to relinquish control of the leasing arrangement with the third party or demand that the Trust directly receive the profit from such an arrangement.  **Additionally**, the creation of the Trust and the transfer of the title to Lot 2 were done after and close in time to when Dr. Goldston decided to stop paying his taxes.  Further Dr. Goldston testified that at the time of the Trust's formation, he had received letters from the IRS regarding his unpaid taxes, although he quickly recanted this statement.  *Dr. Goldston Deposition* [#151-4] at 134:21-135:17.

In relation to these six factors, the Court finds that after the transfer of the title to Lot 2 to High Mountain Holding Trust, very little, if anything changed.  Dr. Goldston continued to use the property, maintain it, and manage it with little to no involvement from the Trust.  *See Novotny*, 90 A.F.T.R.2d at 2002-5696 through -5697.  Further, Dr. Goldston and the Trust maintained a close relationship, including Dr. Goldston's service as the Trust Manager and payment of the mortgage, taxes, and other expenses associated with the property.  The mail for the Trust was directed to and from Dr. Goldston's dental practice in Florida.  Further, Dr. Goldston continued to receive payments from a third party who held leasing rights to the property.  In addition, Dr. Goldston renegotiated the mortgage on Lot 2 in his own name, not the name of the Trust, and there is no evidence that any person interfered with any endeavor Dr. Goldston sought in relation to the property.  Finally, the Trust was created close in time to when Dr. Goldston stopped paying his taxes and after Dr. Goldston may have received letters from the IRS.

21

As to Lot 3, Plaintiff argues that the facts in evidence clearly show that Old Times Holding Trust is a mere nominee of Dr. Goldston.  **First**, although the deed indicated that the transfer was for $10 consideration paid [Docket No. 151-31], Dr. Goldston testified that the Trust did not pay any money to himself or his wife pursuant to the transfer.  *Dr. Goldston Deposition* [#151-4] at 28:5-8.   Dr. Goldston also testified that the only "consideration" received was "a promise that [Lot 3] would be delivered and cared for as we – as we decreed that it should be."  *Id.* at 25:5-10.  **Second**, Dr. Goldston exerted control over the property following its transfer to the Trust (1) by serving as the Trust Manager; (2) maintaining the property (3) paying the mortgage on Lot 2; (4) paying the property taxes; (5) holding the homeowner's insurance for the cabin on Lot 3 in his own name [Docket No. 151-51]; (6) using the property as collateral to obtain or attempt to obtain loans; and (7) mail addressed to the Trust was sent and received by Dr. Goldston [Docket No. 151-46].  *Dr. Goldston Deposition* [#151-4] at 29:25-33:6, 62:4-6.  **Third**, there is a close relationship between Dr. Goldston and the Trust because the Trust would not exist apart from Dr. Goldston.  There is no dispute that he created and named it and served as the Trust Manager (for at least six years and following his receipt of the tax assessment in 1996).  *Id.* at 46:3-51:10.  In addition, the alleged purpose of the Trust was to benefit Dr. Goldston's family members.  *Id.* at 44:16-46:7.  Further, the Trust does not have a tax identification number and has never filed a tax return [Docket No. 151-34].  **Fourth**, Dr. Goldston and his family continued to use the property after its transfer to the Trust. Specifically, Dr. Goldston testified that he and his family used the cabin located on Lot 3 "from time to time . . . maybe a week to ten days a year and other members of the family

as they decided to go and visit and use it." *Dr. Goldston Deposition* [#151-4] at 35:10-15. This use continues to the present time. *Id.* at 35:16-20. While Dr. Goldston acknowledged that he does not pay rent for this use, he insisted that his "rent was paid in sweating and maintenance of the property." *Id.* 35:21-25. Dr. Goldston also testified that he has been unable to travel to the property since 2003, and that he ceased his services of Trust Manager in 1998, so it is unclear how he has "paid" for his family's use of the cabin since 1998 or 2003. *See id.* at 38:14-22, 40:22-41:9. Dr. Goldston also testified that as Trust Manager, he had written permission to use the property from the Trust, but no documentary evidence to this effect has been produced. *See id.* at 40:22-41:9. Further, since he ceased his Trust Manager duties in 1998, it is unclear under what authority, written or otherwise, Dr. Goldston's family still uses the property. **Fifth**, the Trust did not interfere with Dr. Goldston's use of the property, specifically, it did not interfere when Dr. Goldston jointly with the Trust used Lot 3 as collateral to obtain a loan, and attempted a second time to use it as collateral for a loan after the first loan had been repaid by Dr. Goldston. *Dr. Goldston Deposition* [#151-4] at 57:12-18. Further, mail to and from the Trust was addressed to Dr. Goldston, and the Trust did not have a bank account [Docket No. 151-46]. *Dr. Goldston Deposition* [#151-4] at 34:6-23, 62:4-6, 84-92, 128:1-129:24. **Additionally**, the creation of the Trust and the transfer of the title to Lot 3 were done after and close in time to when Dr. Goldston decided to stop paying his taxes. Further Dr. Goldston testified that at the time of the Trust's formation, he had received letters from the IRS regarding his unpaid taxes, although he quickly recanted this statement. *Dr. Goldston Deposition* [#151-4] at 134:21-135:17.

In relation to these six factors, the Court finds that after the transfer of the title to Lot 3 to Old Times Holding Trust, very little, if anything changed. Dr. Goldston continued to use the property, maintain it, and manage it with little to no involvement from the Trust. *See Novotny*, 90 A.F.T.R.2d at 2002-5696 through -5697. Further, Dr. Goldston and the Trust maintained a close relationship, including Dr. Goldston's payment of the mortgage, taxes, and other expenses associated with the property. Likewise, Dr. Goldston's family continued to use the cabin on the property even after Dr. Goldston testified his responsibilities as Trust Manager ceased and he was unable to travel to or care for the property. In addition, Dr. Goldston jointly with the Trust secured or attempted to secure loans using Lot 3 as collateral, and there is no evidence that any person interfered with any endeavor Dr. Goldston sought in relation to the property. Finally, the Trust was created close in time to when Dr. Goldston stopped paying his taxes and after Dr. Goldston may have received letters from the IRS.

The Court finds that Plaintiff has submitted evidence to establish every element of its claim with regard to whether High Mountain Holding Trust and Old Times Holding Trust are nominees of Dr. Goldston. The burden now shifts to Defendants to go beyond their pleadings and tender admissible, relevant evidence to show that summary judgment is not proper. *Celotex Corp.*, 477 U.S. at 324. Because neither WW nor Dr. Goldston submitted competent evidence in satisfaction of their burdens, there is nothing to refute Plaintiff's evidence that these were sham transfers made for the purpose of avoiding tax liability. *See Novotny*, 90 A.F.T.R.2d at 2002-5697 through -5698 (noting that "family trusts" and "paper trusts" similar to the ones at issue here are assets which can be used "to satisfy the tax liability of the individual taxpayer"). Further, Defendants' attempts to downplay or

reinterpret Dr. Goldston's deposition testimony are unavailing. Finally, the Court notes that "[c]ourts have uniformly rejected taxpayers' attempts to limit their tax liability by [transferring property] to trusts . . . ." *Id.* at 2002-5697. Defendants' unsupported contentions, without more, do not prompt a different result here. The Court finds that Plaintiff has established that the Trusts are nominees of Dr. Goldston.

### ii. Alter Ego Theory

Because the Court finds that Plaintiff has shown that the Trusts were nominees of Dr. Goldston, it is unnecessary to consider Plaintiff's alternate theory that the Trusts were also the alter egos of Dr. Goldston. However, the Court notes that "[w]hen an entity is so dominated by a taxpayer that it does not have a separate and independent existence, it is considered [to] be an alter ego of the taxpayer." *Id.* at 2002-5698 (citation omitted). The indicia found to be important to the court in *Novotny* are also present here, namely that: (1) trustee meetings were sporadic or nonexistent, *Dr. Goldston Deposition* [#151-4] at 92:22-93:20; (2) the Trusts have not filed federal tax returns, *id.* at 51:11-17, 92:16-21; and (3) the alleged beneficiaries have little to no involvement with the properties, *id.* at 44:19-47:2, 80:12-16. Indeed, a former Trustee for one of the Trusts, Michael Bloomquist, testified that he had discussions with Dr. Goldston about how to give the Trusts the appearance that they were more than nominees or alter egos of Dr. Goldston. *Michael Bloomquist Deposition* [#151-7] at 96:8-24. He also testified that everything he signed for the Trust as the Trustee had to be approved by the Trust Manager, Dr. Goldston, rather than the other way around. *Id.* at 67:15-20. Further, the Trusts did not have bank accounts to attend to the financial aspects of the properties. Rather, the financial obligations were attended to by Dr. Goldston. *Dr. Goldston Deposition* [#151-4] at 34:6-23, 84-92, 128:1-

129:24. Lastly, the person responsible for receiving the mortgage payments for Lots 2 and 3, Roswell Checketts, testified that in all his dealings with the Goldstons regarding the properties and the financial payments, including the refinancing that occurred after transfer of the title to Lot 2 to High Mountain Holding Trust, he never heard of or had any dealings with any of the alleged Trustees or Trust companies. *Roswell Checketts* [#151-6] at 99:18-100:25; 103:20-104:9. Accordingly, the Court finds that Plaintiff has established that the Trusts are alter egos of Dr. Goldston.

### 3. Summary

There is a dearth of admissible evidence to refute Plaintiff's presentation of the facts as establishing that it had a valid tax lien and that High Mountain Holding Trust and Old Times Holding Trust held Lots 2 and 3 as nominees or alter egos of Dr. Goldston. Although Defendants dispute the interpretation of the facts presented by Plaintiff, they offer only conclusory, unsworn pleadings in an attempt to satisfy their burden as the nonmoving parties. Further, their attempts to reinterpret Dr. Goldston's deposition testimony or suggest transcriber error do not sufficiently satisfy their burden to go beyond the arguments in their pleadings and provide "specific facts showing there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. As such, the Court finds that there is no genuine dispute about any material issue. Because Plaintiff has met its burden as the party with the ultimate burden of proof at trial, summary judgment should be granted in its favor. Accordingly, I recommend that Plaintiff's Motion for Summary Judgment be **GRANTED**.

### C. Defendants' Motions for Summary Judgment

Because the Court recommends that summary judgment be granted in favor of

Plaintiff, and because default judgment has been entered against WW, it is unnecessary to consider WW's Motion or Dr. Goldston's Motion on their merits. *See Lewis v. Four B Corp.*, 211 Fed. Appx. 663, 666 (10th Cir. Aug. 11, 2005) (unpublished decision) (holding that if the court grants summary judgment in favor of one party, "separate review of [the] opposing motion would serve no purpose"). Given that Plaintiff is entitled to summary judgment, the Court necessarily recommends that Defendants' Motions for Summary Judgment be **DENIED**.

### IV. Conclusion

For the reasons stated above, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment [#151] be **GRANTED**.

The Court FURTHER RECOMMENDS that Plaintiff's Motion to Strike [#180] be **GRANTED**, and that Defendant WW's Exhibit C-2 [Docket Nos. 171-2, -3] be **STRICKEN**.

The Court FURTHER RECOMMENDS that WW's Motion [#146] be **DENIED**.

The Court FURTHER RECOMMENDS that Dr. Goldston's Motion [#202] be **DENIED**.

IT IS FURTHER **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have ten (10) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. A party's failure to serve and file specific, written objections waives *de novo* review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v.*

*Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this Recommendation must be both timely and specific to preserve an issue for *de novo* review by the District Court or for appellate review.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated:  July 31, 2008

BY THE COURT:

 s/ Kristen L. Mix

U.S. Magistrate Judge

Kristen L. Mix
